Good morning, Your Honors. May it please the Court, Aaron Avila on behalf of the United States. With me at Council's table is Janet Goodwin from the Department of the Interior. I've reserved five minutes for rebuttal. The Court of Federal Claims erred in two fundamental respects when it denied the United States' motion to dismiss and granted partial summary judgment to plaintiffs. First, contrary to the CFC's conclusion, three appropriations acts passed in 1888, 1889, and 1890 did not establish a trust relationship where the United States' trustee and the loyal Midwakanen and their lineal descendants are beneficiaries. Second, Congress terminated any trust that those appropriations acts may have created when in 1980 it provided that the lands that the Secretary had purchased with their appropriated funds would thereafter be held in trust for three Indian communities, not the loyal Midwakanen. Can I ask you a question just so I understand the procedural posture of the relationship between the two questions that we had certified to us and the ultimate disposition of the case? If we were to say, just hypothetically, that the 1980 Act terminated any trust that may have been created by the appropriations acts, is it necessary to decide the first question of whether the appropriations act created a trust or would not deciding the first question leave parts of the case still subject to further litigation? Based on how the CFC has ruled so far, all of the breaches of trust that he found when he granted partial summary judgment were passed after the 1980 Act or was disposed of. So I think that would resolve the case. If the all of the supposed breaches that the CFC found were post-1980 Act, so there was no trust to breach, so I think that would resolve the case. In other words, if we say even if there was a trust, the trust was terminated in 1980, that would be sufficient? I believe that's correct. I'd like to first turn though to whether the appropriations acts did create a trust because I the CFC's jurisdiction under the Tucker Act, a plaintiff has to identify a specific statutory or regulatory provision that establishes the fiduciary duty that the plaintiff alleges the government failed to faithfully perform. The CFC found that the appropriations acts created a trust relationship and satisfies plaintiff's burden in that regard and they do not. They contain, the acts contain no language suggesting the assumption of any fiduciary obligation on by the United States. Let me ask you though, is it possible that even if the, we don't read the appropriations acts themselves as creating a trust, that because there was so much discretion left in the, to the Secretary of Interior, that the land certificate subsequently issued on his behalf would have created an enforceable trust? I don't think so, Your Honor, because in order to have jurisdiction in this court, it has to be based on statutory or regulatory provisions and those aren't statutory or regulatory provisions and the actions of interior officials can't create a trust obligation that's actionable on the CFC under the Tucker Act. And I'd also add... Even if the statute originally gives, explicitly gives an individual such as the Secretary of the Interior the discretion to do it with what he sees fit? I think that's right because there still has to be statutory or regulatory provisions if the only basis were the Indian land certificates. And I think this court's most recent decision in Navajo Nation actually reiterates that actions of officials can't give rise to a Tucker Act claim. But even if the certificates did create some sort of trust, it was only, and we don't concede that because this court in CERMAC said that the certificates were not allotments, but, but even if they did, it was only a trust going to the certificate holder, not this broad trust that the Court of Federal Claims found that went to the loyal Midwakanen and all of their lineal descendants for all time. Well, I have two questions raised by what you just said. The first one is, as I understand CERMAC, it's certainly true that CERMAC characterizes it as not an allotment, but that doesn't mean it wasn't a trust, right? Well, yes. So CERMAC doesn't speak to the question of whether it's a trust or not. I have a hard time seeing why the certificates don't create a trust. Admittedly, perhaps a narrow right is conveyed under the trust, but why isn't that a trust? Well, I think the IBEIA's decisions in Brewer and Gitchell and I think CERMAC say that the holder only had the right of occupancy for the term of their life, and I don't think that creates a trust allegation. But again, even if it did, it's only vis-a-vis. Well, I could create a trust, could I not, for my child, in which I would say, my child can enjoy the use of my automobile until my child has the first accident, which would be about a week. But that could be a trust, right? The settlor can devise terms limited in very severe ways to a trust, right? That is true, Your Honor, but in any event, that would not be a trust that's actionable. Well, let's set aside the Tucker Act problem, because I want to first try to decide what these Indian land certificates convey. But you say you're not prepared to say they did create trust, even though they use trust language. Right, that's correct, because I really think it was only, and I think the record bears this out, what the Secretary was trying to do was to give an interest, a life, someone the ability to use land for the period of their life so that it was not defeasible or could be encumbered as it happened in the past. Okay, but now what do you do with the language, which I think is in all of the Indian land certificates, that references the heirs? Because the convenience appears to, on its face at least, to include the heirs. How do you read that language such that it is limited to the life of the particular recipient of the certificate? Well, I think, and again, this has been decided by the IBIA and I think the Eighth Circuit case, and the Eighth Circuit CIRMAP case decided this as well, that it was only a life estate for the certificate holder, and the heirs language, I think at most says that the heirs can use the land while that certificate holder is alive. That would be how I would read it, and that would be consistent with how the IBIA has resolved these issues and the long line of authority that has held that these are not inheritable interests and part of the deceased estate when the certificate holder passes away. And what about the difference between this and Duncan then? With Duncan broadly, but it didn't, Duncan didn't explicitly talk about heirs, did it? Well, I think in Duncan it was a, the statutory provisions there were much more specific and didn't invest nearly as much discretion with the Secretary as the statutes here did. There it directed that the Secretary purchase for the Indians tracts or parcels of land, water, water rights, and to have constructed the necessary similar specification in these Appropriations Act, and also what was at issue in Duncan, what was not the existence of a trust, in fact what was at issue was whether the United States had breached, whether the United States had breached its trust by terminating the trust, and it was alleged inconsistent with the Termination Act. I think there's another distinguishing feature in Duncan where there was a subsequent statute where Congress clearly expressed its belief that these lands, that the lands at issue in Duncan were held in trust and would continue to be held in trust until the provisions of the Termination Act were met. So there you, not only did you have more specific duties in the particular statute, you also had something that's absent, that's absent here as well as a subsequent congressional statement that the lands are in trust. In fact, I think the 1980 Act demonstrates just the opposite that Congress did not view the lands as having been held in trust, and I think the 1906 Act that we referenced in our brief also demonstrates that Congress didn't view these lands as being held in trust. Well, that's only the case if you don't construe it as I think the Court of Claims did, which is to say you can read the 1980 Act as being consistent with the trust because you have these trust and trust relationships. Well, I also think though that Congress was very careful in the 1980 Act. It's when it describes the interests that the United States, I just want to get the language right, they said all right title and interests of the United States in the lands which were acquired and are now held by the United States for the use or benefit of the loyal Midwalkin will are hereby declared to be held in trust, and so I think they were, if they had thought the lands were held in trust for the loyal Midwalkin, they would not have said use or benefit. They would have said lands held in trust for the loyal Midwalkin, and that's not the term they used. They used use or benefit. Well, unless they wanted to convey as the Court of Claims suggested, sort of like they retained, they conveyed legal interest to the communities retaining equitable interest with the loyal. Sorry. Go ahead. I think also that reading is just inconsistent with Congress's purpose in enacting the Act. I mean Congress is trying to rectify. Well, it's not inconsistent with the text. I mean it's a fair reading of the text, is it not? Well, I think because Section 3 has a savings clause in it that doesn't specify any trust relationship that it was saving. I think that bolsters our argument that Section 1, and Section 1 was disposing all right title and interest of the United States, and it didn't save anything in Section 3 other than existing contracts, assignments, and the like, and it didn't talk about any existing trust. Facts aren't really clear, but all we're talking here about is a share of casino revenues, right? That's what seems to be going on here. All right, thanks. Do you want to save your rebuttal time? If I could just ask one quick factual question. The total amount of acres is what, 955 acres? I think it's around a thousand. Were all of those acres accounted for by Indian land certificates issued, let's say, prior to 1980? I don't think the record shows that. I would assume they were, but I really don't know. Okay, that's fine, thank you. Thank you, Your Honor. Thank you, Mr. Raveloff. Mr. Cardall? May it please the Court, Counsel, ladies and gentlemen. Is there any beneficiary alive? Oh yes, the beneficiaries are present. But under either the certificates using the Bryson theory or the statutes that you cite as the trust, it's limited just to those people who were actually residing on the land or in possession of the land in the 1880s. I'm surprised if any of them are alive. The statutory text refers to the family thereof. But that's not, though, in the creation of the beneficiary class. The beneficiary class is created by the For the Support Clause, which is very different from the later clause about the may deemed best used. In other words, the uses can include the family, but the beneficiary clause is just those people residing and having renounced their tribal relationship, right? Your Honor, the Appropriation Acts were a congressional response to what happened as a result of the congressional response to the 1862 war, which caused the Indians loyal to the United States to be deprived of their tribal lands, tribal rights, and tribal identity. The effort with respect to taking those Midewakanton left in Minnesota and to put them on a census and then to incorporate them by reference and use the words members of the Midewakanton Band residing in Minnesota since May 20, 1886, and then the supplement of the census, which included nine children born since the 1886 census, plus the added language in the 1890 Act referring to mixed blood, shows that Congress understood, working with Department of Interior, prior to the land being purchased with the funds appropriated under the 1889 and 1890 Acts, that it was intending including the lineal descendants. I missed the link. Yes, the language does, the 89 Act includes those who are on their way to the lands, the 90 Act includes those who are of mixed blood, but it's always those who are on the land having severed their ties to the tribe. Well, that's not true according to the text, Your Honor. I'm looking at the text. Where does it say something more? The 1890 Act refers to that no one became required to move against their will to move to one of these locations, and the way the money was used was, according to record, was honoring the beneficiary's intent to live where they wanted. That's why the lands were purchased in three places, and there was this effort to work together in a remedial way to provide these people a substitute for having the tribal lands. Maybe you could show me in the text of either the Appropriation Acts or the certificates, as Judge Bryson points out, they're quite significant here, anything there which clearly creates a beneficiary class stretching into perpetuity with the descendants. We're grabbing the text. Okay, just show me the language and that'll help us. In the brief, I refer to the language, or family thereof. Yes, but that's, we've already discussed that, that's down in the clause about how the Secretary can disperse the proceeds of the trust if there is such a trust. And by the way, the 1988 Act, as we know, doesn't say family at all. If we're starting there, families don't make it in at the outset. But the land was purchased after the 1980 Act. The 1980 Act included a provision that's saying that the lands that were not dispersed under the 80 Act would be spent. But I think there's some power to the government's argument that the beneficiary class is devoid of any reference to descendants or families. But it does refer to the band and members of the band since May 20, 1886. But they all have to be residing on the land in 1886, having renounced their tribal relationships. So it doesn't matter whether they're in the band or not, they have to be residing there in 1886, having renounced their tribal relationships. Right, and when the list was done in 1889, before the 1889 and 1890 Acts, it included nine children that were born after May 20, 1886, and that's in the record. And so the reason why the land purchases were delayed and the 89 language was changed was to include, including the language family thereof, was to include the lineal descendants. That would have come up when they supplemented the census. That is, what do we do with the children of those who have been born since May 20, 1886? And they had to address that, and so what Congress did was put family thereof, and then they included, necessarily, an amendment clause, an amended clausing clarifying that it would include mixed blood, because you have the whole bloods and half-bloods. We have all that, that's very clear. Where does it say descendants, heirs, anything that will tell us that this beneficiary class is something other than those people living on the land in 1886? Well, I can give you a response to that, and that is the Court's allowed, with respect to the text, if it's to look at the post enactment actions of the United States, and that's consistent for 90 years that the Indian Land Certificates have gone to lineal descendants. In fact, the issue would have come up immediately with the issuance of Indian Land Certificates when it was formally done in 1905. In 1905, they did a list. This was, they're still doing the initial land assignments, and they did a list of people, of course, who were alive at that time, and that would have, again, been, oh, okay, we go forward. The 1901 Act, similarly, looking for consent of the adult beneficiaries. There is never a distinction in the administrative record between those on the original list and lineal descendants. Again, in the 1906 Act, the people who didn't get their acreage because the acreage was given to the government. All these post enactment facts consistently treat lineal descendants as beneficiaries, and further, the 1980 Act states that this land has been held for a certain amount of walk-in under the Appropriation Acts, and that is another post enactment fact. Do you think you can create a trust by a course of conduct? No. Our position is that the tax creates the trust. That $40,000 was intended for a beneficiary class, and then the land was, that money was in a trust, and then the land was purchased with the trust monies, resulting in that becoming part of the trust corpus. And then when we look at the, for my statutory interpretive theory that I presented, we look at that and we say, is that confirmed by what happened after the Act was passed? For 90 years, this is a government program that worked. Lineal descendants got those land certificates. Now, that means lineal descendants were getting land certificates, and over and over again they were told, if you stop using this land, another lineal descendant will get it. There has been a trust relationship. That's an issue that I struggle with in looking through the materials as to exactly what the status of the heirs was, even though heirs are referenced, of course, in the Indian land certificates. The position that the Department of the Interior took starting in 1915 with the merit memo and seemingly going all the way up through the more recent administrative decisions is that the certificate rights, rights conveyed by the certificates, are not inheritable, right? That was their position. Oh, right. Possessory interest. Right. To the particular individual, but nothing that would be conveyable through inheritance, right? That's correct, but to say, to jump from that to that there's no trust relationship. No, I understand. No, I just want to go right, because you're right in 1915, right? But in 1934, the Department of There was no trust. We're not going to allow a federally recognized government here, because this is a community of just randomly selected individuals. Let me ask this about the appropriations. Well, go ahead, you had another point. Oh, I'm sorry. No, please, go ahead. But the point is that the reason the communities exist, according to the record, is because there were a group of Indians who had title to the land. And so no person, government or otherwise, can undo history. And so the communities... Where's the title? The title was in the Indians that reside on the reservation land. The basis in the... And when they died, where's the title? What I'm referring to is the Department of Interior decision in 1934, about 50 years after the census, the Department of Interior said, this isn't a historical tribe, so they don't automatically get a federally recognized government. In the Unionization Act, section 19, it says, oh, and groups of Indians residing on reservations, they can have federally recognized governments. Again, a substitute for my... I'm representing a historical remnant of a tribe, and the federal government was saying, oh, they can have federally recognized government too. And so the Department of Interior sat down and said, okay, who has the title? In 50 years after the census, and the Department of Interior said, title resides in these Midewakernans, these lineal descendants, Judge Raiders, you brought up, and so we're going to give them a federally recognized government. And if we look at the constitutions that were done at the time in 1936, that is both the Lower Sioux and Prairie Island constitutions, Article 9 regarding lands, it incorporates the federal assignment system. It states right in there that lineal descendants will get this land, and it's the federal government that will assign the lands. And so for it to be suggested here that my clients don't have, the lineal descendants don't have the title, would undo all the history that's been done because the communities wouldn't exist unless my lineal descendant clients, some of them that were alive in 1936, were present on that land. Can I shift gears a minute before we run out of time, and that's with respect to reconciling what the 1980 Act did. And I think your argument is that we can reconcile it because it simply transferred legal title of the 86 lands from the U.S. to the U.S. as a trustee for the communities. So that's what you say was the impact of the 1980 Act. Right. And I just wonder what it means to be a beneficiary, a purely legal title. Oh, well, typically a trustee would have legal title and the beneficiaries would have equitable title. Exactly. And it occurs in real estate agreements like a contract for deed and so forth. And so for our part, we read the 1980 Act as being easily reconcilable. The pre-enactment history supports that, and also the legislative history, this limited purpose that the idea was to have the lands be considered part of the reservation. And so if land assignments weren't done, it would be community property. Long-term leases could be assigned by the Department of Interior. It could be incomparable, and then the land could be put to the highest and best use, which actually happened. And our position, consistent with Laura's too, is why can't the 1980 Act benefit the communities and benefit the beneficiaries? I don't know. So I understand. So the beneficiaries get all of the proceeds. They have equitable title. Well, subject to federal law, the Indian Game and Regulatory Act, for example, says a certain fraction has to be retained by the community for economic development. So in that case, both the community and the beneficiaries would benefit. Let me ask you this. Go ahead. Okay. If, suppose in 1888 and years immediately thereafter, the Secretary of the Interior had decided not to create the arrangement by which the land was, the legal title was retained and less than a fee interest was conveyed to the Indians, but instead had decided to just use the appropriation funds and create fee rights in the Indians. That would have been permissible under the Act, would it not? Yeah, trusts terminate all the time. So you have $40,000 appropriated in trust. Let's make sure that we're on the same page here. The Secretary has been given $40,000. Could have spent it on cattle, could have spent it on horses, could have spent it on land, right? I mean, it's for you to decide how to spend it, right? And decides, okay, the $40,000 is going to be spent on land and it's going to be conveyed immediately in fee to the Indians, right? That would have been a choice that would have been perfectly consistent with the statute, correct? Well, it wasn't what happened. I understand, but what I'm trying to get at here, well, first of all, is that it does seem from the language of the statute that that wouldn't have been prohibited to the Secretary as a course of action, correct? I think that the statute states that that $40,000 is subject to the trust. Well, it doesn't say that. It says that the money has to be for the use and benefit of these Indians. Why isn't buying land and It says that each beneficiary shall receive an equal amount. Sure. So that's what he does. He simply decides the number of beneficiaries and he gives fee simple interest. So the subject matter of the trust is the beneficiary's nexus of rights to the trust property. He's saying there's no trust. So if the $40,000 were completely distributed or the land was used to purchase land and then it was distributed, as long as that was done in an equal way for each beneficiary, they had a list of beneficiaries, yeah, it can be distributed. And so, but I don't see why that doesn't mean the $40,000 is trust and because the money was used to purchase the land. I don't see that a lot of times. Real question, but just it seems to me, the reason this seems pertinent to me is that it seems to me to present the question of whether what Congress did is to say to the to create trust, but not for the statute itself to create a trust. May I answer your question? Sure, of course. The trust law recognizes when property is put in the hand of one for the benefit of another, that that's a trust. And so when the $40,000 transferred from the U.S. Treasury to the Department of Interior, it was subject to a trust. And the reason why the trust is still open is the trust corpus, which would include that land, would include the revenues that have been escrowed through 1980 by the United States, and would include any improvements to the land. And so the trust is created at the moment the statute was passed because that's what it says. The trust is the beneficiary's right to the property and that was an equal amount. And so it's no different than that Fisher case. You folks were on the panel. They shall pay. Well, here it says shall receive an equal amount. And so up until 1980, they were escrowing the proceeds from the land. The 1944 Act, they transferred land from the Prairie Island Indian Settlement to the Upper Mississippi Wildlife Game Refuge. Congress appropriated money. It was put in an escrow account. Now why is that money sat in an escrow account from 1944 till today? Why is that? Because they didn't have a complete list and they knew if they distributed the pie, there'd be an overdistribution. Further, additional funds... Did you find anything in the record that shows clearly that the beneficiaries extended beyond those living in the land in 86? The acts that I mentioned? Yeah. Okay, so... Did you find anything that shows some entitlement to be part of the beneficiary class beyond those residing on the land in 1886 who had renounced or who had severed their ties to the tribe? Had there been distributions of the trust corpus after 1886? Okay, I take your answer to be no. You found nothing. The answer is that every... Your course of conduct argument. You made that. Oh, okay. And then, but there's a different argument, according to Duncan, and that is when you have congressional enactments reflecting the existence of trust, that matters too. And so there you have 1901, 1906, 1944, and 1980. And so that ought to affect the court's response to that question. And then, with respect to this notion that the communities are mutually exclusive from the lineal descendants, at the time that the communities were accepted as federally recognized governments in 1936, those would have been lineal descendants having title. Otherwise, those communities wouldn't exist. In response to Judge Bryson, if that were the case, the lineal descendants weren't included, then there wouldn't have been communities. The land eventually, I suppose, would have been given out in fee title. But the people at the time in 1936 wanted to be together, and they applied for federally recognized governments, as the record shows. And so again, this was part of a continuing process that the people wanted, they knew they couldn't be a tribe, but they wanted to be something as close to a tribe as possible. And the federal government has allowed them to do that all the way through the 1980 Act. Thank you, Mr. Cardinal. Thank you for the extra time. Mr. Avila. Just very briefly, Your Honors. The Appropriations Act appropriated funds for the Secretary to expand in his judgment, as he deemed best. They were not held in trust. It was an appropriations act. Well, let me ask you, just in response to Judge Rader's question, and I guess the reservations that other members of the panel might have with respect to whether or not lineal descendants were entitled to anything, what about, I think the other side pointed to the 1980 Act, and the language that taught where Congress recognizes that these lands are held, meaning in 1980, for the use and benefit of certain Indians under the 88 Act. Doesn't that suggest that lineal descendants have some rights here? I think that would explain the state of affairs at that time, that some of the lineal descendants had land certificates, but I don't think, I think that's a very different question than whether the 1888 Act, 1889 Act, or 1890 Acts required and created a trust that ran for time and memoriam to all lineal descendants. I don't think that those acts mandated that or provide any fiduciary obligations to those people, and just very briefly, the title to the land, JA 1771, both legal and equitable title to the 1886 lands were in the United States, and then at JA 1906 through 27 is the technical report where title to the lands is in the United States and was not held in trust. There's no indication that it was held in trust, and with respect to the 1980 Act, we still haven't heard how it is possible for the United States to simultaneously hold these lands in trust for, in a very novel trust on a trust of the CFC found here, and the more natural read is that the 1980 Act terminated any trust that may have existed, and we respectfully request that the court reverse the decision of the CFC and remain for dismissal of the complaint. Unless the panel has any other questions. Thank you Mr. Avila. Thank you.